E-FILED
Wednesday, 21 September, 2005 02:31:04 PM
Clerk, U.S. District Court, ILCD

11

1     that an encounter then, you know.  But other than that,

2     yes, that was the very first encounter I ever had with

3     her.

4          Q     Okay.  Do you have heart problems?  Have you

5     been diagnosed?  In other words, have you been diagnosed

6     by a doctor as having heart problems?  You said chest

7     pain, chest problems.

8          A     Yes, I have random chest pains.

9          Q     Okay.  Was this the first time it ever

10    happened before that you had chest pain and you needed

11    medical attention?

12         A     No, it was not the first time.

13         Q     How many times before this incident had that

14    happened?

15         A     Numerous times.  I can't give you a definite

16    number, but it's happened numerous times.

17         Q     How many years?

18         A     I would say approximately maybe five, six

19    years it's been going off and on going on.

20         Q     Have you ever seen a doctor about your chest

21    pains?

22         A     Yes, I have.

23         Q     What did the doctor say?

24         A     He would give me instruction, advise me to

EXHIBIT

A

GEORGE E. RYDMAN & ASSOCIATES, JOLIET, IL. (815) 727-4363

12

1      watch what I eat sometimes or to maybe slow down on my

2      exercises.  You know, he would give me examinations, EKG

3      tests, you know, stuff like that, you know, and ask me

4      questions, you know.

5          Q      So you've had an EKG test before?

6          A      Yes, I have.

7          Q      What was the result?

8          A      I don't remember the result, but I do

9      remember one time that the doctor said my heart rate or

10     whatever it was looked normal.  He said it looked

11     normal.  But all the other times I can't tell you

12     exactly what the results were.

13         Q      You've never been diagnosed by a doctor as

14     having a heart or chest problem, right?

15         A      I want to object to that question.

16         Q      Okay.

17         A      Because that's basically unnecessarily going

18     into my medical history.

19         Q      Mr. Clark, this is all about your medical

20     history.  I'm going to get your medical history.  This

21     case is about your medical history.  Well, this is about

22     an incident that you claim that you had a heart -- you

23     had a chest problem.

24         A      I had chest pains.

GEORGE E. RYDMAN & ASSOCIATES, JOLIET, IL. (815) 727-4363

13

1          Q      In the past, so that technically would be

2     medical history.  This is about your medical history.

3          ` A      The case is about an incident where I was

4     having chest pains on September 22nd of 2002, not five

5     years ago.

6          Q      I'm sorry.  Actually 29th.  Okay.  Object,

7     but if you could go ahead and answer that.

8          A      Have I been diagnosed by a doctor as having a

9     heart problem you said?

10         Q      Heart problem, internal organ problem.

11         A      No, I have not been diagnosed.  Not to my

12    knowledge I have not been diagnosed as having any

13    internal organ problems.

14         Q      Okay.  So when I look in your medical file

15    I'm not going to find any diagnosis that you have a

16    heart ailment of any sort at all, right?  You would

17    suspect when I look at your medical file that's what I'm

18    going to find, that you have no heart problem, that

19    according to the doctors that have seen you, you have no

20    heart problem; is that correct?  Is that fair to say?

21         A      I cannot tell you what you will exactly find

22    in my medical file.  I do not have possession of my

23    medical file.

24         Q      Okay.  But you've never been diagnosed as

14

1    having a heart problem?

2        A    To my knowledge, no.

3        Q    So you had this chest pain on September 29th,

4    2002.  What did it feel like?

5        A    Sharp internal pains like someone was poking

6    a needle inside my chest.

7        Q    Where?

8        A    And shortness of breath.  In like the center

9    of my chest.

10        Q    Okay.  Did you see a doctor that day?

11        A    No, I did not see a doctor that day because

12    the medical staff and the security staff refused to take

13    me over to see the doctor.  The doctor did order for me

14    to come over there, but it was interfered with.

15        Q    Okay.

16        A    By the defendant.

17        Q    When did you see a doctor next?

18        A    When did I next see a doctor?

19        Q    Yeah.

20        A    Concerning that situation or period?

21        Q    Period.

22        A    I would have to look at the files to tell you

23    that.  I can't pinpoint the date that I next saw a

24    doctor.

GEORGE E. RYDMAN & ASSOCIATES, JOLIET, IL. (815) 727-4363

15

1      Q      Just an approximate.  A couple days later, a

2    week later, a month, two years later?

3      A      I'm not sure.

4      Q      You're not sure.  When had you seen a doctor

5    previous to that?

6      A      Well, to my recollection I could tell you for

7    sure that I saw -- upon arriving here at Pontiac in

8    February, well, in March, excuse me, in March of that

9    year.

10     Q      Of 2002?

11     A      2002.  But between March and that date,

12   September 29th, I can't tell you exactly an exact date

13   that I saw a doctor.

14     Q      But you did see a doctor?

15     A      Yes.

16     Q      And you have seen a doctor since that

17   incident?

18     A      Yes, I have.

19     Q      Okay.  Have you seen a doctor since that

20   incident concerning your chest pains?

21     A      Yes, I have.

22     Q      What did that doctor tell you?  When was that

23   actually?

24     A      Well, to my memory I know that in 2004 I saw

GEORGE E. RYDMAN & ASSOCIATES, JOLIET, IL. (815) 727-4363

16

1    a doctor concerning problems with my chest and also once

2    again I saw a doctor, I believe it was -- I can't

3    remember the exact date.  I would have to check my files

4    and check my medical files as well to see the exact

5    dates because I'm not just going to tell you any old

6    date.  But I have seen a doctor a couple times prior --

7    I mean since that incident concerning that problem.

8         Q    Okay.  Approximately how long after that

9    incident did you see a doctor?

10        A    Concerning chest problems?

11        Q    Concerning anything at all, just an

12   approximate.  I'm not trying to --

13        A    You asked me that question already.

14        Q    All right.  So when was it?  You didn't give

15   me an answer.

16        A    I told you that I cannot remember an exact

17   date.

18        Q    I wasn't asking for an exact date, Mr. Clark.

19   I'm asking for an approximate.

20        A    Approximately when did I see a doctor after

21   that incident?

22        Q    Right.

23        A    I can't say.  I can't say.  I can't say

24   without checking the files.

GEORGE E. RYDMAN & ASSOCIATES, JOLIET, IL. (815) 727-4363

17

1    Q    That's fine.

2    A    You asked me the question that would make it

3    necessary for me to check the files because I can't

4    remember those exact dates or an approximate date.

5    Q    But without a doubt you did not see a doctor

6    or a nurse the day of the incident, right?

7    A    Without a doubt I did not.

8    Q    Okay.  Is Josephina Williams, now Josephina

9    Torrez to your knowledge a medical professional, a nurse

10    or something to that effect?

11    A    No.  Correctional officer.

12    Q    A nurse didn't walk by you that day?  You

13    didn't have a nurse on the gallery that day and she

14    didn't see you or you see a nurse?

15    A    No, I did not.

16    Q    Okay.  What's your understanding of the $2

17    co-pay rule?

18    A    Can I refer you to the Exhibit B that's

19    attached to my complaint or are you asking me my own

20    personal understanding of it?

21    Q    Your own personal understanding of it.

22    A    Well, my personal understanding of the $2

23    co-pay is inmates who are requesting non-emergency

24    medical care will be required to pay a $2 co-payment

GEORGE E. RYDMAN & ASSOCIATES, JOLIET, IL. (815) 727-4363

18

1    fee, but those inmates who are requesting emergency

2    medical care are exempt from paying a $2 co-payment fee.

3    And also even those who are requesting non-emergency

4    medical care will be required to pay the $2 payment upon

5    arrival, upon arrival for that medical treatment, which

6    means that I will be required to sign a money voucher, a

7    P96 form, whatever you want to call it, when I arrive in

8    front of the doctor to receive that care, not before.

9        Q    To clarify, your contention was that you were

10   definitely in an emergency situation, right?

11       A    Yes, I was.

12       Q    Were you fearful for your life?

13       A    Yes, I was.

14       Q    What were you fearful of?

15       A    I was fearful that, first of all, I did not

16   know exactly what was wrong with me, why I was having

17   the chest pains.  Second of all, after I was denied

18   medical attention, there was no telling what might

19   happen to me.  So of course I was fearful of my life.  I

20   did not know what to do to remedy the problem.  You

21   know, I didn't know what might happen.

22       Q    But this was not the first time that you've

23   had these chest pains before, right?

24       A    No, it's not.

GEORGE E. RYDMAN & ASSOCIATES, JOLIET, IL. (815) 727-4363

19

1      Q      How long do they usually last for?

2      A      They vary.  It varies sometimes.  Sometimes

3    it may last for a couple of minutes.  Sometimes it may

4    last a little bit longer.

5      Q      Just so I get kind of an approximate, when

6    you say a little bit longer, do you mean a couple

7    minutes to maybe 10 minutes or a couple minutes to an

8    hour?

9      A      No.  It's never lasted for a whole hour.

10   Sometimes it may last maybe 30 to 35 minutes in

11   duration.  That's the longest that I can recall, you

12   know, the problem lasting.

13     Q      Okay.  How long did this one last?

14     A      On September 29th, 2002?

15     Q      Yes.

16     A      Well, it lasted for a long time.  Probably 35

17   minutes, 30 to 35 minutes.

18     Q      So this was one of the longer ones?

19     A      Yes.

20     Q      How long had it been going on before the

21   defendant showed up at your cell?

22     A      Maybe 10 minutes.

23     Q      10 minutes?

24     A      Maybe 10 minutes before she appeared.

GEORGE E. RYDMAN & ASSOCIATES, JOLIET, IL. (815) 727-4363

20

1      Q    And she showed up at your cell at?

2      A    Approximately 10:45.

3      Q    I'm showing in the complaint it says 10:30.

4   Would you dispute that or it's sometime in that period?

5      A    Approximately in that range of time.

6      Q    Okay.  So it had been going on for about 10

7   minutes.  Okay.  I see here, approximately 10:30 I

8   informed my gallery officer I was having some rather

9   extreme external chest pain.

10     A    She appeared at approximately 10:45.

11     Q    Correct.  So at that point when you told the

12  gallery officer, how long had that been going on?

13     A    Well, as soon as I started having the pains

14  and when I saw the gallery officer I immediately

15  informed him.  It wasn't that long.

16     Q    Would it be safe to say maybe just a minute

17  or two?

18     A    A few minutes.  I would say a few minutes.

19     Q    Okay.  A few minutes.  She shows up at 10:45.

20  What happens then?  What does she tell you?  What's the

21  conversation between the two of you?

22     A    Well, she sees me laying down on my bed, you

23  know, distressed, you know, in pain.  When she appears

24  at the cell and she sees me, she just looks at me.  So I

GEORGE E. RYDMAN & ASSOCIATES, JOLIET, IL.  (815) 727-4363

21

1    tell her what the problem is, you know, even though she

2    is probably already aware of it, otherwise why is she

3    going to call over there.  But anyway, I tell her what

4    the problem is, you know, I'm having serious chest

5    pains, I'm hurting.  That's when she went and got on the

6    phone or whatever.

7         Q    How old are you, Mr. Clark?

8         A    I'm 32 years old.

9         Q    You're having chest pain starting at 27?  Do

10   you have a history of -- does your family have a history

11   of heart attacks or things like that?

12        A    There are medical problems in my family, yes.

13   As far as heart problems specifically, I can't tell you

14   for sure.  I can't tell you all the medical history of

15   all of my family.

16        Q    I understand.  I'm just asking in general if

17   you know if there were heart problems, heart attacks,

18   things of that nature.

19        A    I haven't heard anybody in my family having

20   heart attacks lately.

21        Q    Okay.  So the defendant comes to your cell at

22   approximately 10:45.  How long is the conversation that

23   you have with her at that point in time?

24        A    It was not that long.  Like I just said, I

GEORGE E. RYDMAN & ASSOCIATES, JOLIET, IL. (815) 727-4363

22

1    informed her what my problem was and how I was feeling

2    and that's when she went and got on the telephone.

3        Q    Then she came back?

4        A    Yes.

5        Q    To your knowledge who was she calling on the

6    phone?

7        A    The doctor on duty, which would be Michael

8    Trainer.

9        Q    How long was she gone for that phone call?

10       A    For a few minutes.

11       Q    Five minutes?

12       A    A few minutes.  I mean I can't give you an

13   exact number of minutes.

14       Q    About 5 minutes though?  You're saying a few.

15   It would be an approximate?  Is that what you mean by a

16   few minutes, 3 minutes, 4 minutes, 5 minutes?

17       A    Somewhere in that range.

18       Q    Okay.  What was the conversation with her

19   when she came back from the phone?

20       A    You're duplicating your questions.  You asked

21   me that before.

22       Q    I'm just trying to get a chronology here,

23   Mr. Clark.

24       A    Okay.  When she came back she told me to get

23

1    up and get dressed, that she had spoken to the doctor

2    and that she was having me taken over to the health care

3    unit.

4        Q    Okay.  How long did that conversation last?

5        A    Didn't last too long.  Maybe a couple

6    minutes.  It doesn't take that long to say those few

7    words.

8        Q    You told her at that point in time that you

9    did not have a P96 form?

10        A    When I was getting dressed she asked me do

11    you have a P96 form.  I said no, I do not.

12        Q    How do you obtain P96 forms?

13        A    Usually we ask the cell house staff for them

14    and if there are any in the cell house then they give

15    them to you.

16        Q    Okay.

17        A    If not, there's another alternative.

18    Sometimes you can write over to the law library and

19    explain to them that the cell house doesn't have any and

20    sometimes they will send you some.

21        Q    Okay.  You already knew you didn't have a

22    P96, right?

23        A    No, I did not.

24        Q    So after she asked you for a P96, you looked

GEORGE E. RYDMAN & ASSOCIATES, JOLIET, IL. (815) 727-4363

24

1    for one and said I couldn't find one?

2        A    I looked around and I said to her I didn't

3    have any.

4        Q    That was the first that you had recognized

5    that you didn't have a P96 in your cell at that point,

6    right?

7        A    Exactly.

8        Q    Under normal circumstances when you asked for

9    a P96 how many would you get?  Would you get five or

10   ten?  Would they give you two?

11       A    Under normal circumstances?

12       Q    Yeah.

13       A    It depends on who the officer is.  Some

14   officers bring you one.  Some bring you three, four,

15   five.

16       Q    Okay.  Did you ask her for a P96?

17       A    No, I did not.

18       Q    Why not?

19       A    Because it's not her job to have P96s and

20   second of all I was aware of the fact that I was not

21   supposed to have been obligated to sign a P96 anyway.

22       Q    Because it was an emergency situation?

23       A    That, too.

24       Q    When you say that, too, what do you mean?  So

GEORGE E. RYDMAN & ASSOCIATES, JOLIET, IL. (815) 727-4363

25

1    there's another reason that you wouldn't have signed a

2    P96?

3        A    Yes.

4        Q    What's the other reason?

5        A    Because second of all, even if it was not an

6    emergency situation, the rules say that I'm not supposed

7    to sign a P96 until I appear in front of a doctor for

8    the treatment as I explained to you earlier.

9        Q    Have you ever signed a P96 at your cell not

10   in front of a doctor?

11       A    Yes, I have.

12       Q    So why would that have been an issue here

13   especially when you needed medical attention anyways?

14       A    To answer your question, that was far after

15   that incident occurred.  That was far after September

16   29th, 2002 that I signed a P96 in front of my cell or at

17   the cell.

18       Q    So if you had had a P96 you wouldn't have

19   signed it at the cell anyways?

20       A    I probably would have.  I probably would have

21   because I was in dire need of medical attention and I

22   would just have had to deal with that violation of rules

23   later on down the line.  But I needed medical attention

24   at that time and I probably would have signed it if I

GEORGE E. RYDMAN & ASSOCIATES, JOLIET, IL. (815) 727-4363

26

1    had one.

2         Q    Right.  Okay.  What other symptoms other than

3    sharp shooting pain in your chest did you have at that

4    time?

5         A    I told you that I was having shortness of

6    breath, like a compression, compression in the chest,

7    like a congestiveness.

8         Q    Anything else?

9         A    No.

10        Q    Okay.  So aside from the tight chest and the

11   sharp pains that you were feeling and the shortness of

12   breath, no other symptoms that you had?

13        A    No.

14        Q    Defendant Torrez came back, asked you for the

15   P96 as you were getting dressed, you say I don't have

16   one and I don't have to sign one anyways because we're

17   not in front of the doctor, right?

18        A    No, I did not say that.

19        Q    What did you say?

20        A    She asked me if I had a P96 form.  I told her

21   no.  She said, well, I'm going to have to sign one in

22   order to get medical attention.  I said, I don't have

23   any money on my account anyway.  She said, those are the

24   rules.

GEORGE E. RYDMAN & ASSOCIATES, JOLIET, IL. (815) 727-4363

27

1       Q      What bearing does it have that you don't have

2  any money in your account to sign a P96?

3       A      What bearing does it have?

4       Q      Right.

5       A      They want a $2 co-payment.  They want $2

6  before I receive medical attention so I was telling her

7  that I don't have any money.  I don't have a P96 and I

8  don't have any money.

9       Q      So the policy is if you don't have any money

10  in your account you don't get medical attention?

11      A      No.  According to the policy, according to

12  Exhibit B, the warden's bulletin, it specifically says

13  that the inmate is not supposed to be denied medical

14  attention even though he doesn't have any money, but the

15  defendant did not proceed according to that rule.

16      Q      Are you still supposed to sign a P96 if you

17  don't have money?

18      A      That would be the logical way to do it.

19      Q      Okay.  In response to her saying you have to

20  sign the P96, your response, correct me if I'm wrong, is

21  I don't have a P96 and I don't have any money anyways so

22  what does it matter if you don't have any money if you

23  would just have to sign a P96 even if you don't have the

24  money?

GEORGE E. RYDMAN & ASSOCIATES, JOLIET, IL. (815) 727-4363

28

1        A      Because she told me that I have to give $2 in

2    order to receive medical attention.  She asked me if I

3    had a P96 form and I said no.  She said you have to have

4    the $2 co-payment before you go over there to the health

5    care unit.  I said, well, I don't have any money in my

6    account anyway.

7        Q      Okay.  Well, isn't that what signing the P96

8    does is states that your understanding that you're going

9    to be -- your account is going to be charged $2, right?

10       A      Yes.

11       Q      That's what a P96 is for, is that $2 charge?

12       A      It's a voucher.

13       Q      What does it matter if you didn't have any

14   money?

15       A      Because she told me out of her own mouth that

16   I have to give her a $2 co-payment.

17       Q      You took that as you'd have to pay the $2

18   even though you never had to do that before and all you

19   had to do before was sign the P96 and the $2 would be

20   taken out of your account?

21       A      No.

22       Q      No, that's not what is normal?

23       A      You have certain individuals incarcerated

24   here who do have money on their accounts who are

GEORGE E. RYDMAN & ASSOCIATES, JOLIET, IL. (815) 727-4363

29

1    sometimes treated differently given priority in regards

2    to receiving medical care.  You have guys who are

3    indigent and don't have any money and who are sometimes

4    discriminated against and will not receive medical

5    attention because of their indigence.  You know, when

6    she told me that I'm going to have to give her $2

7    co-payment before I'm taken over to the health care

8    unit, I told her that I did not have any money on my

9    account, but first I told her I do not have a P96 form.

10        Q    When she asked for your $2 co-pay if you had

11   the money how did you think you were going to pay her?

12        A    By way of the P96 form.

13        Q    So if you had the money all you would have to

14   do is sign the P96?

15        A    To my understanding that's how it was being

16   done.  That was the procedure to my understanding.

17        Q    And if you had a P96 and you would have

18   signed it, she would have taken you to see the doctor?

19        A    I can't answer for her.  I don't know what

20   she would have done.

21        Q    Was she indicating to you, you need to sign

22   this P96 and then I will take you to the doctor?

23        A    No.  She asked me did I have a P96 and I told

24   her no.  That's what the conversation was.

GEORGE E. RYDMAN & ASSOCIATES, JOLIET, IL. (815) 727-4363

30

1       Q      She left the cell then, right?  She left your

2   cell?

3       A      Eventually she did, yes.

4       Q      She walked away again?

5       A      Eventually, yes.

6       Q      Did she come back again?

7       A      After the last time, no, she did not.

8       Q      How many times was she at your cell?  She

9   came, left to make the phone call?

10      A      Came and left and that was it.

11      Q      That was it?  The two times?  About 10

12  minutes after she left the second time your chest pains

13  went away?

14      A      I wouldn't say about 10 minutes.

15   . Q      15?

16      A      A little longer than that.

17      Q      15?

18      A      After she left I waited until the gallery

19  officer came back and I spoke to him and the pains were

20  still persisting.  I spoke to him and asked him, you

21  know, what was going on, am I going over to the health

22  care unit or what, you know.  He said he didn't know.

23  He would have to go and speak to the lieutenant.  So he

24  left and I laid down, you know, because I was feeling --

GEORGE E. RYDMAN & ASSOCIATES, JOLIET, IL. (815) 727-4363

31

1      I was feeling sick.  I started feeling light-headed,

2      dizzy so I laid down and eventually the pain abated.  It

3      went away.

4            Q      Who was the gallery officer that you spoke

5      to?

6            A      Officer Attig, A-t-t-i-g.

7            Q      Okay.  After the defendant left for the last

8      time and Officer Attig came to your cell door did you

9      ask him for a P96 then?

10           A      He didn't have any P96s.

11           Q      Did you ask him?

12           A      Not that time I did not, no.

13           Q      How do you know he didn't have any P96s then?

14           A      I was told that there weren't any in the cell

15     house.

16           Q      When were you told that?

17           A      The previous night.

18           Q      By who?

19           A      The gallery officer, whoever the gallery

20     officer was.  I don't remember who the gallery officer

21     was, but the previous night I was requesting for a P96

22     form.  I believe it was for legal purposes, legal

23     postage purposes, and I was informed that they didn't

24     have any in the cell house.

GEORGE E. RYDMAN & ASSOCIATES, JOLIET, IL. (815) 727-4363